Good morning. My client, Jimmy Nathan Moody, has been confined in the state prison since 1990. And since 1990, he's been fighting for freedom, declaring his innocence of the murder and attempted murder charges that a jury found him guilty of. Throughout his journey to this court, he has met many obstacles, lack of resources, many, many different lawyers, many, many different law clerks, many, many different denials of petitions over and over again. He's been asserted many times by the people that the statute of limitations should limit his access to the courts. But I would urge this court, and I know this court realizes that a statute of limitations has never been a limitation on justice. A statute of limitations has never been a tool whereby we deny the innocent access to courts. That's a good speech. I agree with you. But we do it all the time, don't we? Yes, we do, Your Honor. Yes, we do. And I hope that this court will not do that in this particular case because we believe that we have an innocent client. Well, Mr. Peters, let me ask you, the district court found that you couldn't meet the schlup standard given the fact that the declarations that have been filed, whatever the explanation is for taking 16, 19 years to gather them all together, still do not contradict the testimony of the two key eyewitnesses who identified your client as the shooter. Well, Your Honor, I take issue with that. I believe one of the key players was Moses Tillett. He indicated, Your Honor, in his affidavit that he had perjured himself at the trial in these particular proceedings. Another witness that testified for the prosecution, Gilbert Howard, he also indicated that he perjured himself in the jury trial. In addition to that, Your Honor, in our affidavit. Well, I read the declarations. The closest they come is, you know, for as many years as have gone by, they're now saying, you know, I really didn't get as good a view as maybe I should have had to be positive in my identification. They don't say he's not the guy. They just kind of waffle. And I guess the district court found that may be sufficient for impeachment, but it doesn't show actual innocence. Your Honor, what the declarations say, in addition to what the court has indicated, is that the reason they picked out my client was because the word on the street was that he had been the shooter. In addition to that, Your Honor, I would direct the court specifically to the declaration of Mariana Lewis, who indicates that not… The declaration or the unsworn indication? The unsworn, yes, Your Honor. Is that competent evidence? Can the district court reject that out of hand because it's not even made under penalty of perjury? Well, I believe the court can do that if it wishes, Your Honor. However, the statement, for want of a better description, of Mariana Lewis indicates that the defendant not only was not the shooter, but she identifies another individual as the shooter in this particular case. Why don't we have a sworn declaration? She's been saying that since she was first interviewed by the investigator in 1994. Your Honor, we've gone to get sworn affidavits from each and every witness over and over. I'm just asking about Mariana Lewis. She did not want to sign a declaration, Your Honor, indicating that she was in fear because of the gang attachment to this particular case. She lives in a neighborhood, Your Honor, where she is in jeopardy. Yeah, she says that in her declaration. Did you ask for an evidentiary hearing below? Yes, we did, Your Honor. Because I agree with you that the characterization by the district court of some of the declarations is inaccurate. At least one person said, I lied when I pinned it on Mr. Moody. What did the district court say to your request for an evidentiary hearing? They denied it, Your Honor. Because? They indicated, Your Honor, that it was untimely. The request for the evidentiary hearing? Yes, Your Honor. When was it made? It's been made, Your Honor. It started out being made in the Superior Court of Los Angeles. When I first got on this case, I believe that would have been in 2005. And it's been made over and over to every court up the ladder. And it's basically been denied on the basis of time limits. Mr. Peters, can you address, we have to find equitable tolling here in order to even hear the claim. Yes, Your Honor. But my reading of the record suggests that that claim was never made in the district court. So why hasn't it been waived? What claim, Your Honor? For equitable tolling. Your Honor, we asked for equitable tolling. That's my understanding. Can you give me a citation to the record where I could confirm that? Because I haven't been able to find it. No, Your Honor. I don't have that. So you think you did, but you're not sure. That's my understanding, Your Honor, that in every proceeding that we've indicated that because of the claim of innocence, that the SLEP should not apply and that the court should be able to hear and grant us a hearing on this issue. Well, the magistrate judge in her report definitely addresses the equitable tolling. So you must have made it. Yes, we did. Did you make it before us? Is that what the question is? I don't know what the court is asking, Your Honor. We appealed from the findings of the district court, and therefore, we believe it's probably before this court. It is. You raised it at page 17. I don't understand the waiver argument. Do your briefs cover that issue? Yes. Yes, it does. It's on page 17. It does. And, Your Honor, what is interesting also about this case is that when the court removes the identifications that were made and now have been recanted, if the court removes that from the record, there is absolutely no physical evidence, there's no forensic evidence, there's no evidence at all that ties Mr. Moody to this case. What do we do with the note that was found in his dresser drawer about eliminating witnesses? Well, there's been no, Your Honor, tie to Mr. Moody of that particular note. In fact — Wait, you say no tie. It was found in his bedroom dresser drawer. I understand that, Your Honor. I understand that a note was found. However, if the court recalls, that note was allegedly authored by another individual. There's been no — Was there a handwriting analysis done? No, Your Honor. Was there a fingerprint analysis done? No, Your Honor. In fact, that's what I mean by saying that there was nothing that ties Mr. Moody to that note, other than the fact that it was found. I definitely — Well, I mean, it's circumstantial evidence. The motive, is it not? Isn't that what the State argued?  Your Honor, however, if the witness's testimony is not reliable, then that note standing by itself means absolutely nothing. Do we know anything about how the note got there? No. There was no testimony at all after that note. And in fact, Mr. Moody, if the court recalls, testified in his own behalf at his trial, and it indicated that he was not aware of that note, if the court recalls. I believe that was the testimony at his trial. So most of the witnesses, I guess, with the exception of Marion Lewis, are members of the rival street gang? Yes, and that's what's very interesting. Usually what happens is that the rival street gangs, they're not going to go out of their way to help a rival gang member. So what we have here, and that's one of the difficulties in getting these affidavits, is that the rival street gangs had to be persuaded to, hey, look, do the right thing. So we have rival street gang members who are recanting their testimony, and that's very strong evidence because they have absolutely no motive to lie on behalf of Mr. Moody. But do they have a motive to tell the truth? I mean, part of the problem is that none of them are now subject to the penalties of perjury, but they are certainly subject to the coercion among rival gang members in prison. Well, the opposite thing, Your Honor, is that, say, for example, they are saying that, look, we put Mr. Moody in here and we lied and committed perjury in relation. That puts them in danger right there. So the argument is that their testimony is more credible because they are putting themselves in danger by saying that we lied initially. Well, I think the question I was asking really was based on an observation that the district court made, that these are folks who are, in their own right, serving life sentences, and adding more time is no big deal for these guys. Didn't the district court say that? Yes, Your Honor. Are you talking about time or physical danger? Physical danger. No, I was just asking you about the fact that it doesn't mean anything under penalty of perjury because what are you going to do? They're already in prison for life. You can't add additional time to them. I understand that, Your Honor, but the court is well aware that a witness can be impeached by prior felony convictions, and they can be obviously questioned about their gang membership, but that is only one indicia of credibility. Here we have them making inconsistent statements, impeaching themselves, admitting that they perjured themselves. In addition to that, we have other witnesses who are saying that, hey, these witnesses that perjured themselves, at least one of them was a block away, Eric Collide. He was a block away in a phone booth and certainly could not have observed what he testified to. So what's happening is that we have another witness. So do we have to find that polite line when he said that the guy walked by him, saw that he was wearing red, and said, how are you doing, blood? I mean, he had to be pretty close to him to see him and say that, didn't he? Well, a block away, Your Honor. He walked, the shooting occurred down the street, and he walked. But polite testimony was he was 25 feet from him when he said that. Yes, but he walked. He had to walk back to where the car was and got in the car. Right. So doesn't that corroborate polite testimony that they were close enough that he could speak to him as he walked by him? Well, that was subsequent to the shooting, Your Honor. But polite identified him as the shooter as he was walking back to the car after the shooting. Well, polite, Your Honor, they're all recanting what they said. Polite didn't recant his testimony. Who represented your client at the trial? The name of the individual who represented him, I don't know, Your Honor, off the top of my head. It was not me. I was in the public defense office at the time. I mean, you don't know who the trial lawyer was? I don't know his name, Your Honor, off the top of my head. I didn't think his name was of any... Well, of course it is. I mean, you don't even know who the trial lawyer was. I've read the record, Your Honor. I just don't recall his name off the top of my head presently. But it's clear, Your Honor, that our petition was not based upon the trial lawyer's conduct. Our petition is based upon newly discovered evidence and on the fact that the witnesses who did testify in the previous proceeding have now recanted. Well, I'll tell you this. You see, to me, the most compelling item I read here was Mariana Lewis' statement. Yes, Your Honor. She talks about the environment there. She talks about the fear there. She talks about the culture there. She talks about how people fear, what they're afraid of. You don't bring that up at all, which surprises me. I know what goes on in those places, because I've lived in this town all my life, and I've watched all the changes that have taken place. And I found what she had to say compelling. Because when people are afraid for their lives, when they're scared, when they live in fear, they don't know whether they're going to get killed by some crazy person who's driving around, firing guns at other people. And this person that stops and talks to him, I think his name was Tweet. I mean, I can remember those names. Do you remember the name of that guy? I remember Dick Tweet, Your Honor. And how he looks a lot like the defendant in this case. Yes, Your Honor. And Jimbo, there are five different people called Jimbos and all that. Yes, Your Honor. What does that mean, Jimboy? Jimbo, yes, Your Honor. Jimbo, okay. Yes, Your Honor. So I can understand. It doesn't make sense that when she makes a statement like this that she doesn't want to sign it. But I can understand that when people are frightened. And in her own way, it was compelling, her fears. Didn't she make the same statement in 1994? Yes. The problem, Your Honor, is that the court is aware that one affidavit or one unsworn affidavit standing alone is going to get me more questions than I'm getting now in front of this wonderful body. So when I got the case, obviously what I tried to do was to have, you know, to beat every bust and to try to find if there were other witnesses who could corroborate Mariana Lewis. Other witnesses who... What was the station that investigated this? Your Honor, I believe it was the... Was it Rampart? Was it 77th? What was it? You know, that's kind of important, too. Well, if it was Rampart, Your Honor, I believe that obviously they have a reputation for dishonesty in our community, Your Honor. The thing, Your Honor, I'd like to say about... What was it, the 77th Street? That's my sort of recollection, but I'm not positive, but I believe it was the 77th, Your Honor. I'd like to say this, Your Honor, and the court indicated that I did not bring up Mariana Lewis, but I believe, Your Honor, that in every proceeding that we've had, we've indicated that Mariana Lewis is a very credible witness, and not only for the reasons that this court has indicated, but because she actually names a shooter, and that puts her in a position where her life is definitely in jeopardy, and that's one of the reasons I indicated to the court that getting her to make a statement, in my view, was a very difficult thing, but a wonderful thing. I thought I read somewhere that Big Tweet is dead. Well... Did I not see that in the record, or am I making that up? I don't recall reading that anywhere, Your Honor, but I could be mistaken. I thought I read somewhere where one of the witnesses says he was later killed. Actually, that might be true, but Your Honor, however... So if she identifies... As the court has indicated, these gangs, Your Honor, and I grew up in Watson, these gangs, they are continuing bodies. It doesn't matter whether Big Tweet is dead or alive. His friends, his rival gang members will take Mariana Lewis out for naming one of their gang members whether he's dead or alive. That is the culture of these gang members, because what happens is that when she names one of her gang members, then all of a sudden, what about the other people who are in the car? See, Big Tweet's identity may lead to jeopardy of the other people who are in the car. She said, I think, that she wasn't able to really see who the other people were. I understand that, Your Honor, but the gang members don't really care about her... She could have been just saying that. Exactly. They don't care about that. They want to eliminate her to make sure that that is not a long-term possibility. So that's why, and the court always talks about indicia of credibility, things that make a statement on its own more credible, more reasonable, more believable. And the fact that this lady has come forward placing herself in jeopardy, she's not just a person who says, oh, it was not my client. She actually names a name. She actually names someone. Well, I told you I was impressed by her statement. Yes. And then we have... Why don't we hear from your 13 minutes overtime? I'm sorry, Your Honor. I'm sorry. Let's hear from the state. May it please the Court, good morning. Kenneth Hearn, Deputy Attorney General on behalf of Respondent, the Warden in this case. Just if I could answer a few questions from previously. I'd like to know... Now, we have... How many people testified eyewitness identification at the trial? Two for the murder, one of whom didn't physically appear at trial, but his preliminary hearing testimony was read. This testimony came in on a transcript, huh? Correct, Your Honor. So you've got two eyewitness identifications, and we've got lots of cases that say eyewitness identifications are inherently unreliable. There were two eyewitnesses who testified for the murder and two for the attempted murder, Your Honor. Were they the same? I mean, are you talking about Tillett and Howard? No, Your Honor. For the murder, the thing you have to remember is that there were two incidents. One was on December 30, and then one was two days later, January 1. There were two witnesses who testified that the defendant committed the murder, one of whom was Moses Tillett. His prelim testimony came in. He didn't physically appear. And Howard, right? No, Your Honor. Jimmy Lee Jones, Jr. was the one person who came before the jury, pointed out the defendant, and said, that's the guy that murdered Raymond Smith. Now, was he from the rival gang too? I don't believe he was affiliated with a gang, Your Honor. And to focus on the fear factor that's been mentioned this morning, Mr. Jones was so afraid of Mr. Moody that he moved out of state before the trial happened. He came back to testify at the trial about this case, but he moved out of state because he was afraid of retaliation. But the point I'd like to make is the one person. What was the basis for getting the transcript and the evidence? They couldn't find Tillett for trial. Huh? They couldn't find Mr. Tillett at the time of trial. They just couldn't locate him. They tried to subpoena him. They looked for him. They had a due diligence hearing in the Superior Court. They couldn't find him. He was declared to be unavailable. So, anyway, just to recapitulate, there was one person who identified the defendant in terms of the murder before the jury at trial. That was Mr. Jimmy Lee Jones, Jr. And the thing that I think is interesting is we've never heard from him. We've never had a declaration from him. He's never recanted. Is he the one who moved out of state? He moved out of state because he was afraid of Mr. Moody. Do you know where he is? I don't know. I haven't tried to find him, Your Honor. Anyway, but the thing I think is interesting is that other than the eyewitness identification, is there any other physical evidence, fingerprints? No, Your Honor. This is primarily an eyewitness ID case with the exception of the note that was found in Petitioner's. That's all you got? Yes, Your Honor. You got the note and the two ID witnesses. The two ID witnesses for the murder, Your Honor, and then two separate ID witnesses for the attempted murder two days later, one of whom, Eric Polite, again, like Mr. Jones, Mr. Polite, sat in court before the jury, said that's the person who fired the gunshots. And once again, we've never heard from him. There's never been a declaration from him. Never any discussion about efforts to try to get a declaration from Mr. Polite. But he sat in court throughout the trial from the beginning. I don't think that witnesses are allowed to sit through whole trials, Your Honor. No, you said he sat in court. He sat in court before the jury at the trial of this case, pointed out the defendant at the counsel table and said, that's the guy who fired the shots that day. He identified the defendant in the courtroom. And we've never heard from him. And all we've heard is from other witnesses who say, Mr. Polite couldn't see what he claimed he saw. And number one, when I've tried to do that in superior court, the judge – I'm sorry. Is that the person we're calling Mr. Polite? Polite, I'm sorry. Okay. What is it? Is it Mr. Polite? I have no idea, Your Honor. All I know is – Okay. I'm calling him Mr. Polite. Sorry. It's probably better to call him Polite, so I'll be consistent. Okay. But in any event, Mr. Polite, number one, other people can't say what Mr. Polite could see when they were in different locations. In other words, I can't say what members of this court can see right now, although I suppose that one of you could testify what the other could see because you're seated right next to each other. But Mr. Polite and the other witnesses to the January 1 shooting were at different places. And the other thing that the declarant – and I think it was Hubbard, as I recall – the one thing that Hubbard fails to take into account, as the district court noted, is he moved. He moved from the phone booth to the sidewalk. The defendant walked by and said, what's up, cuz? There was a streetlight nearby. He walked right by him. And then Mr. Polite, I believe, went back towards the direction of the phone booth. But the point is that when the witnesses say that he couldn't see him from the phone booth or from the phone, I think that's extremely misleading because he moved. One thing I wanted to say in response to an earlier question was Mr. Moody was represented at trial by Earl Brody, who was one of the most well-known trial attorneys in Los Angeles, at least in the 1990s. I don't know if he's still practicing. According to the transcript, at least one of the detectives worked in South Bureau Homicide. Well, Earl Brody is talking about the father of the son. I believe it's Earl Brody. Earl Brody, Jr., your honor. So Detective Flores worked at South Bureau Homicide, not Rampart. And that's at excerpts of Record 286. So this is not a Rampart case in case there's any confusion about that. The one point I'd like to make about the Schlute standard is that this case came out of 77th Street. All I know is that one of the detectives worked at South Bureau. South Bureau covers more than one precinct, does it not? I don't know. But I think the shooting happened very close to 77th Street. Isn't that where the patrol officers came from, 77th Street? I believe so. But also just very close to 84th Street is where the shooting happened. So when we talk about the Schlute standard, Judge Kuczynski in this court's decision, Lee v. Lambert, talked about in light of the new evidence, it has to be so convincing that every juror would vote to acquit had the juror been aware of the new evidence. It's a very high standard that no juror would vote to convict, basically is the way they phrase it. I guess the question that I have on my mind is, that's a standard for actually getting through the statute of limitations bar. But in this case, there wasn't an evidentiary hearing, and there seems to be a lot of declarations that were considered unsworn testimony. And I guess I'm thinking, why shouldn't you have an evidentiary hearing on whether or not he meets the Schlute standard for piercing through the statute of limitations? I think, Your Honor, that, respectfully, the answer to that question is, I think that when you look at the declarations that they're based on, they just don't get you there. Well, I think some of them do. I think Marianne Lewis, even though it's unsigned, she's been consistently saying it wasn't Moody since 1994. And there's, I think, Howard, who says, one of the two key people said that he lied. I don't know whether the prosecutors were aware of that or not, but he says he lied at the trial. So there's a lot of testimony that seems to be an evidentiary hearing on getting these people in there and having them cross-examined, which is just to say, is there enough to get through the statute of limitations not to grant him relief? Because that's a whole other ball of wax. I think the district court was in the best position to determine whether or not it wanted to have an evidentiary hearing. The district court in the Larson case, which we're quite familiar with, the district court in that case took it upon itself, because of the convincing value of the declarations there, there the district court wanted to hold an evidentiary hearing. It was a very helpful hearing when evaluating. The magistrates run these things. Yes. Well, in terms of reviewing the case on appeal, it's very helpful to have that evidentiary hearing. What we have in front of us is exactly what the magistrate judge had in front of him or her. I don't know who it was. So our standard of review in large part is de novo. So we're looking at the same thing the magistrate judge did. Correct. You just want to get to the truth of it. Well, correct, Your Honor, and I certainly appreciate that. But I think the thing you have to remember is you have to look at the length of delay, and the Supreme Court in Perkins said the length of delay should be considered in terms of how persuasive the showing is. In terms of whether or not you – it's one factor in determining whether or not you've met the Schlupf standard. Correct. That's one factor. But it's not just the delay. It's not just the unexplained delay of 19 years. And one point is, and the district court pointed this out too, Mr. Moody had a six-year windfall before the ADPA statute of limitations was enacted. In other words, the crime was 1989 and early 1990. He was convicted in 1990, later in 1990. And then it wasn't until 1996 that ADPA was enacted, and defendants like this defendant, Mr. Moody, basically got a one-year grace period, a window period, whatever you want to call it, such that they had until April – I believe it was April 24, if memory serves – April 24, 1997, the time we filed the federal petition, the idea being, look, you can't hold the statute of limitations against somebody who failed back before there was a statute of limitations. So that's only fair. But the point is, Mr. Moody had until April 1997, basically seven years from the crime and close to six years or more than six years from the time of the trial, to file something in district court, and he didn't do it. So he had the six-year windfall, and then there were long periods of inactivity, even in the state court. Well, we put a lot of barriers in front of people who want to assert their constitutional right of habeas corpus. That's the way the system works today. Some have said the great writ is the great joke. But maybe back to Mariana Lewis. Didn't she have in that statement of hers that people came by and fired at her while she was in her vehicle at one time to kind of let her know that according to what she had to say, that they're keeping their eye on her? I don't remember that statement. That's in there. That's in there. And she's the one that said she saw that Wheatie came by and she was getting into her vehicle and then called her over and asked her where a certain address was on that street. And she told him that it's down the way. You've got to go towards Broadway and all that. And so she knew Wheatie, and I think she had been dating his cousin. Do you remember that? I don't remember that, Your Honor. That's in there. And so I think maybe I'm incorrect on this. I had to look. But I think that she'd met Wheatie earlier somewhere. And so this was before the shooting took place. But she was. It was a series of incidents that happened to her that were very frightening. That's what she said in her unsporn interview in 2004, Your Honor. In 1994, Ms. Lewis executed a declaration where she said none of this. So she flip-flopped between 1994 and 2004, at which time she had a son in prison. And I think that's important. So she had a prison connection like almost all the declarants in this case, with the exception of Mr. Harvard. Would you say she had what in prison? A son. One of her sons was in prison. One of her sons was in prison. Yes. And I think that's important because, number one, in terms of trying to understand the motivation for these people to come forward, you know, as I stand here this morning, it's been almost a quarter of a century since the murder, almost 25 years. And so in terms of trying to understand, you know, that period of delay, I think that that's one explanation. One point I'd like to go back to also is that, although this was largely an eyewitness ID case, there was a note that was mentioned before. And the note, and there was no handwriting analysis or fingerprints on it. But the point was. Can you tell me why that was so? No, I can't, Your Honor. All I know is what's in the record. In terms of handwriting analysis, my guess is that they never thought it was the defendant who wrote the note. It was an order of his. Yeah, but, you know, you're supposed to be professionals. You're supposed to kind of tie things together tight. So you get a note, and it's in his drawer, I guess, where he lived. And nobody bothered to check for fingerprints? Your Honor, there's no fingerprints. Handwriting analysis? I mean, that doesn't sound very professional. Well, they probably didn't need it in light of all the eyewitness IDs, Your Honor. Well, all they had was two eyewitnesses. Two eyewitnesses for the murder. Yeah. And the two eyewitnesses for the shooting two days later. Four eyewitnesses total. I thought the state's theory was that the note was written by another gang member who was in lockup at the time directing Moody to eliminate witnesses in his case. Big Dan, Your Honor. Big Dan. The note was signed by Big Dan. And that's the point. That's why I think how come they didn't do handwriting analysis. They never thought it was the defendant who wrote the note. It was an order to him to kill somebody else. Right, but how do you know he saw the note? How do you know he held the note? I don't know, Your Honor. It was in his bedroom dresser, though. I have to tell you. So wouldn't you want to know if it's fingerprints were on the note, if he actually seen it? Your Honor, in my bedroom dresser, there's no notes in there other than what I put there. I don't think that people ordinarily put items and pieces of paper in other people's bedroom dressers. You know, I was on this case named Allen. You might remember Allen. He was executed. And he sent notes from prison all the time directing people to kill people. And you don't know how they ended up getting that note. We know that Dan didn't put the note in the drawer, but we don't know that the defendant ever actually got the note. Someone had to get the note to him, if that was your theory. Correct, Your Honor, but it was in his bedroom dresser. I mean, it wasn't in a public place. Who has access to somebody's bedroom dresser other than the person who sleeps in that bedroom? I mean, I suppose it's possible somebody could have broken into the house and planted the note. Did he live by himself? Did he live with other people? I don't know. I don't think the record says either way. And, again, all I know is it's in the record. But, again, I just think it's quite a coincidence. I thought the bedroom was in his mother's house. I don't remember, Your Honor, that there was any testimony about how many other people lived there or whose house it was. But I know it was his bedroom. The point I'm trying to make is it was his bedroom where he slept. And this is a note that was found in his bedroom. And the point is take care of the witnesses. Very important. Big Dan. And then, lo and behold, after that, you know, after that note is there, there's one person that's killed and another person that's shot in the back. How do you know when the note was put there? I forgot about the name being on the note. I don't remember that. Your Honor, the note was signed by Big Dan, Module 3301. And I presume that's L.A. County Jail because it sounds like one of the L.A. County Jail modules. And, by the way, the note said give to Lamar to tell Jimbo to take care of the witnesses. And I did read the DA's closing argument because I also was puzzled by this. And it's not clear. Witnesses to what? I don't know. Nobody ever knew. But the point is I think the theory is that Big Dan, whoever that is, was visited by somebody named Lamar. And he gave Lamar a note, and that note was passed along to Mr. Moody with directions to, quote, unquote, take care of the witnesses. Well, don't they have guards there that watch notes being passed? Yeah, I believe that's true, Your Honor, but I believe that it's a sad fact of life that, you know, notes and contraband are passed all the time in jail visiting rooms. But be that as it may, Your Honor, the note was signed by somebody named Big Dan, Module 3301. So that sounds certainly like it came from County Jail. And I'm not saying that that's Mr. Peter said, and I agree with him. That's not conclusive proof that the defendant's guilty of these crimes. But the point is it's substantial corroboration, I think. The one thing that I'd like to say also is that when you compare the showing made in this case, whether or not you're talking about actually meeting the Schliep standard or even proffering enough evidence, really, to kind of require an evidentiary hearing in the district court, I think you have to contrast the showing made here with the showing made in that very, very, very small universe of cases where the Schliep standard has been met or, frankly, where there's been an evidentiary hearing held in the Superior Court. And I've briefed this in some detail, but I'd like to just briefly recapitulate. In House v. Bell, which I believe is a capital case, there was new DNA evidence that tended to exonerate the petitioner. In the Carrier case, there was recantation of trial testimony, but coupled with a confession by the person who was recanting that said, it wasn't the defendant who did it, I did it. And we don't have that here. In the Lisker v. Knowles case, you had new forensic evidence that was not before the jury that was deemed, in the opinion of the district court, to effectively dismantle the prosecution case. That didn't happen here. And in the Larson case, which I know the court is familiar with, there was found to be credible new evidence of witnesses who had never testified before the jury and who could explain their delay. Mr. and Mrs. McNutt had moved away out of state, and they didn't know the defendant had been charged. And that's not the case here. A lot of these defendants were at the scene and knew about the trial, and some of them testified at the trial. Also, the other thing I think is interesting about the Larson case is that, like in the Carrier case, you had a witness who said, I did it, and that was Hewitt, also known as Bunker. Hewitt did a declaration saying it was my knife, and he told his girlfriend, I'm the one that threw the knife. So that's how come, I think, that's one of the reasons why the showing in those cases was substantially stronger than the showing made here. Previously, there was some discussion about Mr. Tillich's declaration, and if I could quote briefly from excerpts of Record 324, I cannot say whether Moody did or did not shoot that day. Mr. Hatter, I was not there. Mr. Edward Day, I did not see the shooting. Mr. Howard, I did not see the shooter. So these are the new witnesses who have come forward and given declarations, and they're very, very equivocal, and they don't rise to the level of, had the jury been known about these declarations, or had these witnesses testified that way at the time of trial, can we say that every juror would have voted to acquit? And I think the answer is clearly no, and I think the reason why is, you have to look at Mr. Jones' testimony about the December 30 murder of Mr. Smith, and I think you have to look at the testimony of Mr. Polite regarding the January 1 shooting. And again, both Mr. Jones and Mr. Polite sat in the courtroom, pointed out the defendant, identified him, and we've never heard about either Mr. Polite or Mr. Jones since, in terms of why there's no declaration from them. So I would respectfully submit that the showing made in this case was wholly insufficient to either meet the standard or to acquire an evidentiary hearing in the district court. What is the standard for the evidentiary hearing? I'm not aware of any published case that's held that's provided a holding on that point, Your Honor. I guess, but I did anticipate that question coming here today, and I guess I have two thoughts, one of which is, I think district courts are in the best position to determine that, and in the Larson case, the magistrate judge wanted a hearing, she held a hearing. In this case, it's very clear from reading the report and recommendation that the magistrate judge in this case was totally unconvinced of the showing made here. You have a bunch of state prison inmates coming forward 16 years after the conviction, 19 years after the shootings, and they're coming forward and saying, two of them recanted, which is, you know, as a prosecutor, that doesn't make me warm and fuzzy to hear two people say, I identified the defendant at trial, but I didn't really see it. That's not great, but it's not the same as reading the Shmoop standard when you have other witnesses who did positively identify the defendant in the courtroom and where there's been no showing at all about why there's no declaration from them. So you like the idea that federal courts act as arbiters of state prosecutions. In other words, it all ends up in the federal court. You have a conviction in the state court, and then there's post-conviction petitions or an appeal and post-conviction relief in the state court, and that exhausts it. Then it comes to the federal court, right? Yes. So you like the idea that the federal courts then take a very close look at it. Well, thank God. That's my job. Otherwise, I wouldn't have a job. But why doesn't the state court take a close look at it? Well, Your Honor, the state courts, numerous state courts in this case, did uniformly reject the showing made for many of the same reasons. But they sent a postcard out. No, that's not true, Your Honor. The Superior Court did go through these declarations in some detail, and the district court, I believe, adopted that analysis. But the district court in one of the different petitions that were filed, and there were numerous petitions filed over, again, we're talking about a period of a quarter of a century here. The Superior Court did talk about there's no explanation for the delay. The identifications were equivocal. There was no statement about who did do the shooting. And so they weren't, with all due respect, they were not postcard denials. What about Mariana Lewis? Your Honor, again, her statement was unsworn. She did a declaration in 1994, and then 10 years later, she's interviewed. Apparently, as far as I can tell, was probably not willing to do a declaration. So, number one, in 1994, she did a declaration on a penalty of perjury saying, I saw some guys in the car. Moody wasn't one of them, but I can't identify any of them. In 2004, unsworn. Say Moody wasn't one of them. Correct. That's what she said in her 1994 testimony. So she's consistent now. Moody wasn't one of them. She's consistent on that point. What she's not consistent on is 2004. She comes forward and says, oh, now I'm willing to tell you who did it. And she wasn't willing to do that in 1994. Because she was scared to death. Well, that's one explanation, Your Honor, and another explanation that she's lying. Well, that's a rational explanation, isn't it? Or it's another rational explanation that she's lying. Why would all these people lie now? Well, Your Honor, they're almost all in prison. Mariana Lewis has a son in prison. And weird things happen in prison. You know, when you talk about the Crips and the Bloods and do they have an incentive to testify against rival gang members, everything changes when you hit the big house. The gangs there are different than the Crips and the Bloods in south-central Los Angeles. And a lot of times realignments shift. And I can't say that's what happened here because I don't know. But realignments shift and gangs change in prison. And a lot of times in prison, it's not, you know, when we do gang cases in Los Angeles, a lot of times they're African-American gangs and Hispanic gangs. And almost always, unfortunately, they're aligned against each other. African-American gangs are fighting other African-Americans and Hispanics are fighting other Hispanics. In the state prison system, that kind of tends to kind of go by the wayside and it becomes very polarized from what I understand having been in a few prisons, including Pelican Bay, is that it's African-Americans over here and then you have Hispanics over here and then you have whites over here. And realignments change. So can I tell you for sure that that's why these people are doing the declarations? No, I can't do that. I thought the Supreme Court said it was unconstitutional to segregate people in prison by race. I'm talking about voluntary gang associations, Your Honor. I'm not talking about where they're housed. I'm talking about the gangs that kind of unfortunately have very big swaying in a lot of the state prisons, irrespective of where they're housed. There are gangs in state prisons and they tend to be divided up on racial lines. One other question because I don't understand. So tell me, articulate why Mary Lewis is less credible because her son is in prison. Again, she's susceptible, and again, I can't prove this mathematically or scientifically. Tell me your argument about it. Her son might need help in prison. He might be pressured. He might be pressured by Mr. Moody or friends of his the same way that maybe these other people were. And if it's not pressure, maybe it's favoritism. But the point is, when you're in prison, you need help. People who are there, they want to have friends. They don't want to make other people who are powerful angry. And the point is, the way that possibly she could help her son is by doing this declaration now. And the thing I think is interesting is all these declarations, the two people that, as far as I know, are not in state prison, Jimmy Lee Jones and Eric Polite, they didn't do declarations. Everybody else who did declarations with the exception of Mr. Hubbard was either in prison or was respecting Ms. Lewis, her son was in prison. And you have to wonder why is that? Why is it that the two people who aren't in prison, we've never heard from? Am I correct in reading the record? In between her declaration in 1994 and her interview in 2004, had Big Tweet been killed? I seem to recall that, Your Honor. Her interview was fairly long, and I think I remember reading that somewhere, but I can't point to the page of that. And if it wasn't in her declaration, it was somewhere. I just can't point to the particular page where that happened. So in closing, I would like to point out that this is not a rare or extraordinary case, those phrases being used by the Supreme Court and Shloop and this court in Lee v. Lambert. This is not a rare or extraordinary case where the defendant has really kind of proved his innocence. At most, what he's done is he's kind of created some minor conflict in the evidence  But keep in mind, the defendant had an alibi defense of trial. He had numerous witnesses who testified on his behalf, and they weren't believed by the jury. So I think when you look at this case and you compare it to the showing made in House v. Bell, Lister v. Knowles, Lee v. Lambert, and the Larson v. Soto case, the showing made here just doesn't come close to standing up. And it's not just the delay, it's not just the fact that most of the people that did the declarations are in prison. Unlike Mr. McNutt, who I seem to recall was a former police chief. So this is the credibility of people that we're comparing, and can you evaluate credibility in a declaration without a hearing? I would proffer that in some instances, yes. And I think that when you have felony convictions in prison status, which under California law is by definition a grounds for impeachment, when you compare the credibility there. But also, but more importantly, and this is really the gist of the point I'd like to make this morning, is you have to look at the substance of what they said. And the substance of what the declarants said in this case is just not close to what was said, for example, in the Larson case or even the Carragher case where one defendant said it wasn't the defendant who did it, I did it. And here, you know, it's easy to say, well, I tried and I identified Mr. Moody, but now, you know, I didn't really see what I said I saw. I don't know who did the shooting. That's easy to say. Yeah, but we know that eyewitness identification is inherently unreliable. Your Honor, I know that eyewitnesses say that. If I could tell a quick story. The felon just moved out of the house that was next door to me. You don't agree with that statement? I think eyewitness identification can be reliable, and I know in cases where… Yeah, but in most cases, in many cases, it's not reliable. I don't agree with that, Your Honor. Can I tell you a story? Is this about the jury, Your Honor? No, it's one I've been waiting to tell you. The jury? So I was on the Superior Court for a while, and I had a prosecutor, great guy, Cy Rose. He was like Edward G. Robinson, you know. He knew how to try a case. Then I had another guy. He thought he was real smart and all that and clever, and he was a Stanford man, see? So he was supposed to know everything. And so here he was, an eyewitness identification. I remember we had one case. It was a pro per. Anyway, he made a big argument about this is the man, Eki Omo, and all the rest of it. The defendant was, I think his name was William Shakespeare, and it was an armed robbery of a Standard Station. And so the jury went out and found the defendant not guilty. And then throughout that year, he was always arguing about eyewitness identification and how accurate it was, and he went on that way. And so then about a year goes by, or maybe a year and a half, and I'm down at the L.A. Athletic Club. I run into him. And I say, Hi, John. He looks at me. I'm like, I said, John, don't you recognize me? He said, no, no, no, no, no, no. I said, John, I'm a person that you saw for almost one year, five days a week for one year. I'm Judge Pregerson. He said, oh, Judge, I'm sorry. He couldn't recognize me. He couldn't make it out. He saw me. He saw me. He was there every day. I had three DAs in the courtroom. He was there. And after a year going on eyewitness identification and arguing, it's reliability when he sees me a year later. He has no idea who I am. You know, Your Honor, a lot of times when I go to the gym, I don't wear my glasses and I'm sweating, so that's one possible excuse. But if I could tell a quick story, I think it's kind of a good point. Dr. Stephen Clark just moved from the house next door to me where I live, and he made his living in part and taught at UC Riverside, and he also testified in many cases that I've handled. What did he do at Riverside? He's a professor of psychology. Oh, OK. And so but on his spare time, he testified in criminal cases, and I've handled his appeals where he's one of these eyewitness ID experts who says, gee, eyewitness identification is inherently unreliable, and when it's strangers and it's cross-racial and when there's a gun, you can't really rely on it. So anyway, so one day he's getting out of the shower at his house, and here's the doorbell ring. This is the UPS guy dropping off a package, and he says, well, I guess I'd better go get the pair of shoes that he ordered. So he says, I'd better go in a bathrobe and go get it. So he throws on his bathrobe, and as he goes down to open up the door, the UPS truck is driving away, and a woman had come up the driveway or come up the sidewalk, took the package, and was running away to a car nearby, and he got a glimpse of her face. And I thought it was kind of ironic, given that he was an eyewitness ID expert who testified, and he called the police. And I said, gee, Steve, if they catch this woman, are you going to be able to ID her on court? And he said, absolutely. And I said, even though you never saw her before? And he said, that's correct. And I said, aren't you afraid that somebody like you is going to get up there and impeach him? And he said, bring it on. So my only point is, people say that eyewitness IDs are unreliable, but in that case, a guy who made his living talking about how eyewitness IDs were unreliable wanted the police to arrest somebody for stealing his property. Well, he probably had a camera that took pictures. I never mentioned it to you, Your Honor. It was not in the record of the conversation between us. I know of the same incident. A relative of mine and the UPS guy put the package down, took a look at it, and stole it. And all these cameras, they're watching all this. I'm pretty sure there's not a camera in the recording. I have a question that's related. You never know the answer. I think we're going back to the point that... Do you know we're taking your picture now? I assume so, Your Honor. No, I'm serious. I have a question. I don't think so. I have a question about all of these people. I mean, you make very good arguments. And one of the ones you made was that these people are all people who are in jail. These are all the people who were around in that environment who you probably would hope would end up in jail for committing all these crimes. So who else does he get for his witnesses? How about Mr. Jones and Mr. Polite? We might ask that of your counsel if he wanted to sit down since you're 28 minutes over. Thank you, Your Honor. Pleasure to be here today. Thank you. Can I tell you something? Yes, Your Honor. You're the best lawyer the attorney generals have ever sent down here. Well, thank you. I'll be sure to repeat that when we get back to work. I'd order the transcript of that. Yeah, I think you did a very good job, too. Usually the attorney generals, deputy attorney generals, won't concede anything and aren't reasonable about anything. But I think you've done a very good job. Well, thank you. Knowing that the court had written a Larson case, I had to try to walk a little bit of a tightrope today. Say that again, I missed it. Knowing that Judge Wardlaw had written a Larson decision, which came out a few weeks ago, I had to be a little bit careful here about what I said about the Larson case. This is kind of an observation. Well, I'm glad to be here. I'm glad to read our cases. Thank you. I did do a 28-J letter on the case last week, by the way, on the Larson case. Thank you. Thank you. Sir, what about Mr. Jones and Mr. Polite? We tried to find them, Your Honor, and we were unable to. And I do know... Who's them? Mr. Jones, the witnesses that the Attorney General has referred to as being his credible witnesses. Are they in jail or not in jail at this point? I have no idea, Your Honor. We've been unable to locate them. And I do know... You'll pick up the phone and find out who's in jail. I understand that. Your Honor, I should tell the court that we've had... At least I've had two separate investigators running down each and every one of the witnesses who testified and who did not testify in this particular matter. And I should tell the court that we tried to locate every witness. We're not hiding anything. This is not a case where we received declarations and slid them under something. We don't do that. We located each and every witness that we could and tried to locate each and every witness that testified in the proceedings. Mr. Peters, let me just say it's been a pleasure to hear both of you this morning. Thank you, Your Honor. I wish all of our arguments were as good. And I do apologize for not remembering my good friend, Earl Brody, Jr. I've known him for years. In fact, Your Honor, I've had the dubious distinction of representing his son in a very bad capital case where he retained me to represent his son. And that's probably why I drew a blank on him. I didn't want to remember that. Well, look, they went much way over time, the state did, than you did. And so you got rebuttaled. So I'm not cutting you short. No, Your Honor, I... Do you think you could locate these other witnesses? Your Honor, obviously we will try and continue to try, but this Court is aware we run into these time limitations. The argument that we always get from the people is, hey, you're sitting on your feet. I mean, you sat on this for this time. You sat on this for this time. So once we get as many witnesses as we can get, or we feel that we can get in a reasonable time, we present that to Your Honors for your review. You know, everyone is cynical. I would say that everyone is cynical about the innocent man. You know, everyone says, oh, they all claim that they are innocent. That's the argument that I've been getting since 1976 when I first joined the Defenders Office. I'm not cynical. I'm not saying you are, Your Honor. No, you said everyone is. Oh, I'm sorry, Your Honor. Everyone excepting Your Honor. No, no. I have never been an exception. Yes, yes, but it's very important that we get it right. One of the wonderful things about our judicial system is its corrective mentality. We always want to correct a wrong. We don't want to stand behind limitations. We don't want to stand behind time constraints and have an innocent man suffer the consequences. So our declarations, especially the one of Mariana Lewis, at least puts us in a situation where we should have an evidentiary hearing. This is not a situation where the courts rule in favor of an evidentiary hearing that Mr. Moody is released from prison and go home. It's not that situation. This is a situation where we're simply asking for a hearing at which the Attorney General can impeach those witnesses with their prison ties, can impeach those witnesses with whatever evidence, whatever evidence they have for impeachment, and test them. That's all we are asking for, that our witnesses be put in a situation and that their witnesses be put in a situation where a court of competence can make an informed decision as to whether or not we have met our burden. And that's what we're asking for. Mr. Peters, I'm very sympathetic to your argument. The problem I'm having in light of the decisions that we've gotten from the Supreme Court on timing is the best answer you could give me for why it took 16 years to gather all these declarations together was that you had to wait until these witnesses sort of found religion and now are willing to do the right thing. Do you have anything more to add to that answer? That's not the best answer that I'm giving you. I, Your Honor, have not had this case for 16 years, as the court knows. But Mr. Moody, Your Honor, and the court has considered this, that it's very difficult for a man who is incarcerated in the state prison or any other institution to get the resources together where he can, from his prison cell, make all the efforts that are necessary to stake his claim, so to speak. So during this entire period of time, Mr. Moody has had to rely on family members. He's had to rely on law clerks. He's had to rely on underpaid lawyers. I'm one of them. And, you know, in order to get involved in his case. So he's had that burden. The court knows about the law library in state prisons. The court knows about what's available to an inmate who's been found guilty of murder. A lot of times they're in the high-powered prisons, the high-powered cells. They don't have access. It's not like he was out on the streets at the beach going somewhere. I mean, what he's done with the help of a sick father, really, and a brother who's here in court today, gone to the offices of at least three lawyers, at least, hired investigators on meager funds. These are people, as the court is aware, are from the inner city. They don't have a lot of money. So they're in a situation where they have to do the best they can. So is that the explanation for why it took 10 years to get back to Mariana Lewis? Well, Your Honor, I frankly, to answer the court's question straight, I frankly don't know what happened between the first interview of Mariana Lewis and when I and my offices interviewed her again. I'm sorry, Your Honor. When did you get on this case? I believe, Your Honor, it was in 2005 or so, something around that time. Yeah. And I have not slept on this case. I've proceeded with due diligence at every turn on this case, brought proceedings in every court that I knew of, and have gone out and gathered all these witnesses that the court has affidavits on. I didn't mean to suggest by my question that I was criticizing the way you handled it. No, no, and it wasn't a criticism directed at you. It was a question as to why, I mean, these murders occurred in 1989. Yes, sir. And, I mean, it was 16 years old by the time you got on the case. Yes, sir. Okay. Well, we have a lot of cases where evidence pops up after 20 years and matters are investigated and we find all kinds of things that point to a person's innocence. But the question— But I'm going into all these things that happened, you know. Yes. So, well, that was a good argument. Thank you. And you know what percentage of habeas petitions are granted? I would think, Your Honor, a very, very low percentage. If there's 1,000 filed, do you have any idea how many are granted? Oh, if it's 1,000, I would say two or three. Maybe a little more. You're very correct. Yeah. So that's why I say the great writ many times turns out to be the great joke. Yes, sir. And there's lots of reasons for that, that all these barriers that have been put in people's paths, all they've had the effect of doing is to create more work for the courts, that create huge amounts of employment up and down, so it's good for the economy. Well, at least something is. Now we have, when I first got on the district court, we didn't have magistrates. We didn't have any of that. Now we have more magistrates, and they're good people, and they work hard. But it's all these barriers that are put up in people's paths that are supposed to make the system more efficient, but it just doesn't work that way. And that goes for a lot of other areas. Anyway, complimented the gentleman from the state government, attorney general's office, and you're a good lawyer. Thank you. Damn good lawyer. I can... And to me, Mariana Lewis, what she has to say... Just reading, and her language, and the way she spoke, and it was rough, but there's an underlying emotion there. There's an underlying sense of fear, despair. Well, thank you for a very clear argument. Thank you. Thank you both. Thank you.
judges: Pregerson, Wardlaw, Tallman